IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MERIDITH JONES,<br><br>     Plaintiff,<br><br> v.<br><br>FELIX GRAY, INC.,<br><br>     Defendant. | Civil Action No.<br><br>COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Meridith Jones ("Jones" or "Plaintiff"), for her Complaint against Felix Gray, Inc. ("Defendant"), by and through her counsel, alleges upon personal knowledge as to herself and upon information and belief as to all other matters, based upon the investigation conducted by and through her counsel, which included, among other things, an investigation of Defendant's digital properties, as follows:

## NATURE AND SUMMARY OF THE ACTION

1. This action arises from Defendant's failure to make its online store accessible to blind individuals,[1] which violates the effective communication and equal access requirements of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-12189. These provisions were enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities"[2] by "assur[ing] equality of opportunity, full participation, independent living, and economic self-sufficiency."[3]

---

[1] Jones uses the word "blind" to describe individuals who, as a result of a visual impairment, have substantially limited eyesight. This includes individuals who have no vision at all, as well as, people who have low vision.

[2] 42 U.S.C. § 12101(b)(1).

[3] 42 U.S.C. § 12101(a)(7).

2.      Although styled as an individual action, the injunctive relief that Jones seeks will inure to the benefit of an estimated 2.3 percent of the United States population who report having a visual disability,[4] and to Defendant, who will extend its market reach to this population.[5]

3.      For this significant portion of Americans, accessing websites, mobile applications, and other information via their smartphones has become a necessity, not a convenience. In contrast to the largely stationary internet of the early 2000s, Americans today are increasingly connected to the world of digital information while "on the go" via smartphones.[6]

4.      Indeed, a growing share of Americans now use smartphones as their primary means of online access at home. Today, roughly one-in-five American adults are "smartphone-only" internet users—meaning they own a smartphone, but do not have traditional home broadband service.[7]

5.      The growth of smartphone usage is rivaled only by the myriad ways in which users can harness the capabilities of the internet for the betterment of their lives through education, employment, entertainment, commerce, and countless other pursuits.

---

[4]      Erickson, W., Lee, C., von Schrader, S., Disability Statistics from the American Community Survey (ACS). Ithaca, NY: Cornell University Yang-Tan Institute (YTI), available at www.disabilitystatistics.org (last visited May 18, 2020).

[5]      Sharron Rush, W3C Web Accessibility Initiative, *The Business Case for Digital Accessibility* (Nov. 9, 2018), available at https://www.w3.org/WAI/business-case/ (last visited May 18, 2020) ("The global market of people with disabilities is over 1 billion people with a spending power of more than $6 trillion. Accessibility often improves the online experience for all users.").

[6]      The wide-scale adoption of this technology is staggering. According to Pew Research Center, the vast majority of Americans—96%—now own a cellphone of some kind. And the share of Americans that own smartphones has climbed from just 35% in 2011 to 81% in 2019— amounting to more than 265 million people in the United States. U.S. Census Bureau, U.S and World Population Clock, available at https://www.census.gov/popclock/ (last visited May 18, 2020) (U.S. population on June 12, 2019 was 328.1 million).

[7]      Pew Research Center, *supra* note 6.

6.      The U.S. Chamber of Commerce has documented consumers' increasing reliance on mobile platforms to shop online:

> The average consumer spends more than $1,700 per year on online shopping, a number that's continuing to rise. The convenience, affordability and ability to compare prices with ease has led more and more customers to visit e-commerce sites before heading to a brick-and-mortar location.[8]

> New research by Leanplum found that 95% of consumers will buy at least half of their gifts online. Shoppers, especially millennials and Gen Zers, favor the convenience and the great offers and discounts associated more with shopping online than visiting a brick-and-mortar location. It's these groups that are driving e-commerce retailers to be strategic with their Digital Platform design. The Leanplum survey found that 80% of respondents shop on their mobile devices.[9]

7.      But, "[a]s technology continues to evolve at a rapid pace, it is important to consider factors that can facilitate or impede technology adoption and use by people with disabilities."[10]

8.      This is especially true with respect to accessing the internet by smartphone, where people with disabilities stand to benefit immensely if online services, like an online store, were fully and equally accessible to them. The National Federation of the Blind explains:

> In many ways, individuals with disabilities rely on Web content more so than their nondisabled peers because of inherent transportation, communication, and other barriers. A blind person does not have the same autonomy to drive to a covered entity's office as a sighted person. A deaf or hard of hearing person does not have

---

[8]      Emily Heaslip, U.S. Chamber of Commerce, *A Guide to Building an Online Store* (Sept. 20, 2019), available at https://www.uschamber.com/co/start/startup/how-to-build-online-stores (last visited May 18, 2020).

[9]      Emily Heaslip, U.S. Chamber of Commerce, *5 Ways to Optimize Your E-Commerce Site for Mobile Shopping* (Jan. 6, 2020), available at https://www.uschamber.com/co/run/technology/building-mobile-friendly-ecommerce-websites (last visited May 18, 2020); *see also* Emily Heaslip, U.S. Chamber of Commerce, *The Complete Guide to Selling Online* (Jan. 28, 2020), available at https://www.uschamber.com/co/run/technology/small-business-ecommerce-guide (last visited May 18, 2020) ("According to one report, e-commerce is growing 23% each year[.]").

[10]     National Council on Disability, *National Disability Policy: A Progress Report* (Oct. 7, 2016), available at https://ncd.gov/sites/default/files/NCD_ProgressReport_ES_508.pdf (last visited May 18, 2020).

the same opportunity to call a covered entity's office. A person with an intellectual disability does not have the same ability to interact independently with the staff at a covered entity's office. The 24-hour-a-day availability of information and transactions on covered entity websites and mobile apps provides a level of independence and convenience that cannot be replicated through any other means. That is why the number of Americans who rely on the Internet has increased year after year and why entities offer information and transactions through that unique medium.[11]

9.      When digital content is properly formatted, it is universally accessible by smartphones to sighted and blind consumers alike. When it's not, blind individuals are required to expend additional time and effort to overcome obstacles not applicable to sighted consumers, which may require the assistance of third parties or, in some instances, may deny outright access to a company's online service.[12]

10.      Unfortunately, Defendant's online store is not properly formatted, and as such, deprives blind of the chance to fully and equally access Defendant's online services, which services are otherwise available to nondisabled consumers.

11.      This action seeks to remedy that discrimination and inequality.

---

[11]      Comment from disability rights organizations to DOJ Supplemental Advance Notice of Proposed Rulemaking "Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities," C RT Docket No 128, RIN 119-AA65, available at https://www.federalregister.gov/documents/2016/05/09/2016-10464/nondiscrimination-on-the-basis-of-disability-accessibility-of-web-information-and-services-of-state (last visited May 18, 2020), Answer 57 (October 7, 2016) (citations omitted).

[12]      *See* Kasey Wehrum, Inc., *Your Digital Platform is Scaring Customers Away. 5 Easy Ways to Fix It* (Jan. 2014), available at https://www.inc.com/magazine/201312/kasey-wehrum/how-to-get-online-customers-to-complete-purchase.html (last visited May 18, 2020) (documenting the most common causes of shopping cart abandonment, including: "Your Checkout button is hard to find[,]" "Shoppers question the safety of their personal info[,]" and "Getting through the checkout process takes multiple clicks.").

## JURISDICTION AND VENUE

12.     The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

13.     Defendant attempts to, and indeed does, participate in the Commonwealth's economic life by offering and providing products and services over the internet to Massachusetts residents, including Jones. Unlike, for example, a winery that may not be able sell and ship wine to consumers in certain states, Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Massachusetts residents.[13]

14.     Jones was injured when she attempted to access the Digital Platform from Reading, Massachusetts, but encountered barriers that denied her full and equal access to Defendant's online goods, content, and services.

15.     "Massachusetts has a strong and historic interest in adjudicating this dispute involving its blind residents. It is the home of the Perkins School for the Blind, which was America's first school for the blind. Helen Keller was taught there."[14]

16.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Jones's claims occurred.

---

[13]     *See Access Now Inc. v. Otter Products, LLC*, 280 F.Supp.3d 287 (D. Mass. 2017) ("*Otter Products*") (exercising personal jurisdiction over forum plaintiff's Digital Platform accessibility claims against out-of-forum Digital Platform operator); *Access Now, Inc. v. Sportswear, Inc.*, 298 F.Supp.3d 296 (D. Mass. 2018) (same).

[14]     *Otter Products*, 280 F.Supp.3d at 294.

## PARTIES

17.     Jones is a natural person over the age of 18. She resides in and is a citizen of Reading, Massachusetts, located in Middlesex County.

18.     Jones was born with partially detached retinas. She could perceive some light until 2015. Today, Ms. Jones has very little usable sight. As a result, Jones is a member of a protected class under the ADA, 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq.*

19.     As a result of her visual disability, Jones relies on screen reader auxiliary aids, including JAWS 2020 from Freedom Scientific and VoiceOver with iOS, to access digital information, like an email, a website, or an app.

20.     Defendant Felix Gray, Inc. is a Delaware corporation. Its principle place of business is located at 132 Crosby St., 7th Floor, New York, NY 10012.

21.     Defendant sells glasses direct to consumers. Unlike retailers in the past, Defendant does not operate a brick-and-mortar retail storefront that Jones can visit in Reading, Massachusetts, where she lives.

22.     In order to access Defendant's products and services, Jones must visit Defendant's digital properties at https://shopfelixgray.com/ and https://help.shopfelixgray.com/ (the "Digital Platform").

23.     Defendant owns, operates, and/or controls its Digital Platform and is responsible for the policies, practices, and procedures concerning the Digital Platform's development and maintenance.[15]

---

[15]     *See* Felix Gray, Terms of Service, available at https://shopfelixgray.com/terms-of-service (last visited May 18, 2020). ("Felix Gray, Inc. (hereinafter "Felix Gray," "we" or "us") provides this website, … .").

24.     A judgment consistent with the relief sought herein would not unduly burden Defendant; nor would it be commercially unreasonable to order Defendant to make its Digital Platform compliant with the ADA. Defendant sells and ships its products throughout the entire United States, including Massachusetts, and internationally; maintains a robust social media marketing campaign, including into Massachusetts; and has more than 46,000 followers on Instagram, including from Massachusetts.[16]

### STANDING UP FOR TITLE III OF THE ADA

25.     "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination."[17] "It was called the '20th Century Emancipation Proclamation for all persons with disabilities.'"[18] "Title III of the ADA contained broad language covering numerous public accommodations; both new construction and existing facilities were required by the statute to remove barriers to access. The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the

---

[16]     Instagram, felixgrays, available at https://www.instagram.com/felixgrays/ (last visited May 18, 2020).

[17]     Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), available at http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (last visited May 18, 2020) (*citing* H.R. REP. No. 101-485, pt. 2, at 28-29 (1990)).

[18]     Kelly Johnson *supra* note 17 (*quoting* Russell Hymas & Brett R. Parkinson, Comment, *Architectural Barriers Under the ADA: An Answer to the Judiciary's Struggle with Technical Non-Compliance*, 39 CAL. W. L. REV. 349, 350 (2003), available at https://scholarlycommons.law.cwsl.edu/cgi/viewcontent.cgi?article=1166&context=cwlr (last visited May 18, 2020)); *see also* 136 CONG. REC. 17,369 (1990) (statement of Sen. Tom Harkin) (discussing how facilities have failed to comply with the ADA by not removing barriers that impede access).

7

inability to choose."[19] "However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[20]

26.     Thirty years "after the passage of the ADA, numerous facilities are still not compliant leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[21] and private individuals[22] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[23]

27.     Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[24] most of which "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[25]

28.     The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that it "cannot investigate every place of public accommodation" for ADA compliance and that "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[26]

---

[19]     Kelly Johnson *supra* note 17 (*citing* Elizabeth Keadle Markey, Note, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 FORDHAM L. REV. 185 (2002), available at https://ir.lawnet.fordham.edu/flr/vol71/iss1/4 (last visited May 18, 2020) (arguing for a more lenient standard for standing under the ADA)).

[20]     Kelly Johnson *supra* note 17 (*citing* Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. REV. 1, 3 (2006), available at https://www.uclalawreview.org/the-perversity-of-limited-civil-rights-remedies-the-case-of-abusive-ada-litigation/ (last visited May 18, 2020) (discussing the need for private enforcement in Title III of the ADA and the fact that the limitations courts are placing on ADA plaintiffs are causing abusive litigation)).

[21]     42 U.S.C. § 12188(b).

[22]     42 U.S.C. § 12188(a).

[23]     *Id.*

[24]     *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[25]     *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007); *D'Lil v. Best Western Encina Lodge & Suite*s, 538 F.3d 1031, 1040 (9th Cir. 2008).

[26]     Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, Case No. 1:09-cv-03157 (D. Md.), ECF No. 38, at 1 (July 6, 2010); *see also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement,

29.     So has the U.S. District Court for the District of Massachusetts.

[Defendant] also points to the number of cases filed by the same plaintiff in this jurisdiction. Counsel have filed nine cases in this jurisdiction on behalf of [the plaintiff]. I am not impressed by this argument. If the ADA were enforced directly by the government, as are, for example, the fair housing laws, it is likely that government lawyers would have reached out to disabled individuals — "testers" as they are called — to find out which businesses were complying and which were not. [The named plaintiff] has functioned here as a "tester," which is entirely appropriate.[27]

30.     Consistent with the policies summarized above, Jones assumes the role of private attorney general to ensure she and consumers like her may access Defendant's digital services fully and equally.

## SUBSTANTIVE ALLEGATIONS

31.     The internet is a significant source of information, services, and transactions with instant and 24/7 availability and without the need to travel to attain them.

32.     People who are blind access the internet and mobile applications from smartphones and/or personal computers by using keyboard controls and screen access software, which vocalizes information presented visually on a computer screen or displays that information on a user-provided refreshable braille display. Such software provides the only method by which blind individuals can independently access the internet and associated computer programs. When websites and mobile applications are not designed to allow for use with screen access software, blind consumers are unable to access the information, products, and services offered through the internet.

---

and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

[27]     *Norkunas v. HPT Cambridge, LLC*, 969 F. Supp. 2d 184, 194 (D. Mass. 2013) (Young, J.) (*quoting Iverson v. Braintree Prop. Assocs., L.P.*, No. 04cv12079-NG, 2008 WL 552652, at *3 n.5 (D. Mass. Feb. 26, 2008) (Gertner, J.).

33.     Screen access technology has existed for decades[28] and widely-accepted standards exist to guide entities in making their websites and mobile applications accessible to screen access software, including legal standards under Section 508 of the Rehabilitation Act. The U.S. Department of Health & Human Services even maintains Best Practices for Accessible Content to ensure that accessibility is "considered throughout the [website] development process."[29]

**Defendant's Inaccessible Digital Platform**

34.     Defendant owns, operates, developed, procured, maintains and/or uses the Digital Platform for the purpose of providing consumers with information, services, and products through computers, smartphones, and other mobile devices.

35.     Defendant is required to ensure that its Digital Platform and electronic communications are accessible to people with disabilities. Despite this obligation, Defendant has denied and continues to deny blind consumers meaningful access to the information, services, products, and other information it offers through the Digital Platform.

36.     Specifically, Jones attempted to access Defendant's Digital Platform from Reading, Massachusetts using the VoiceOver application for iOS (*i.e.* on her iPhone).

---

[28]     Annemarie Cooke, American Foundation for the Blind, *A History of Accessibility at IBM* (Mar. 2004), available at https://www.afb.org/aw/5/2/14760 (last visited May 18, 2020) (Jim Thatcher created the first screen reader at IBM in 1986.)

[29]     *See* U.S. Department of Health & Human Services, usability.gov, Accessibility Basics, available at https://www.usability.gov/what-and-why/accessibility.html (last visited May 18, 2020).

37.     "VoiceOver is a gesture-based screen reader that lets you enjoy using iPhone even if you don't see the screen. With VoiceOver enabled, just triple-click the Home button (or the side button on iPhone X or later) to access it wherever you are in iOS. Hear a description of everything happening on your screen, from battery level to who's calling to which app your finger is on. You can also adjust the speaking rate and pitch to suit you. … You can control VoiceOver using a simple set of gestures. Touch or drag your finger around the screen and VoiceOver tells you what's there. Tap a button to hear a description, then double-tap to select. Or flick left and right to move from one element to the next. When  you interact with an element, a black rectangle appears around it so sighted users can follow along. When you prefer privacy, you can activate a screen curtain to turn off the display completely, but still hear all that VoiceOver has to say. And now with iOS 13, you can choose from a wide range of gestures and assign those you're most comfortable with to the commands you use most."[30]

38.     Below is an example of another online store's successful use of detailed alternative text to describe its products to screen reader users.[31] The image on the left illustrates what shoppers perceive visually. To the right, is an image from the online store with the alternative text highlighted for that image in green. Although invisible to the eye, screen access software reads this highlighted text aloud in order to describe the image to shoppers who cannot perceive content visually. In this example, when shoppers tab to the image file with a screen reader, the online store

---

[30]     *See* Apple, Accessibility, https://www.apple.com/accessibility/iphone/vision/ (last visited May 18, 2020).

[31]     *See* Custom Ink, Homepage, https://www.customink.com/ (last accessed May 18, 2020).

announces, "One burlap and cotton tote bag with a custom printed architectural company logo." Blind shoppers require descriptive alternative text like this to access digital content fully, equally, and independently.



39.    Unlike the example above, Jones is unable to understand, and thus is denied the benefit of, much of the Digital Platform's content and services on her smartphone because Defendant has failed to build and maintain its online store in a manner that is compatible with screen access software, including VoiceOver.

40.    As a result of visiting the Digital Platform, and from investigations performed on her behalf, Jones found that the Digital Platform denies her full and equal access to the goods and services that Defendant offers. For example:

a.      Defendant prevents screen reader users from accessing some primary content.  For example, when consumers visit the Digital Platform from a new IP address, Defendant displays a pop-up window inviting them to "learn why Felix Gray glasses are the best solution for Digital Eye strain." Consumers who perceive content visually can type their email into the text field that Defendant provides in this pop-up window, then click "SIGN UP" to access this featured content. Unfortunately, Defendant does not alert screen readers of this pop-up window.



Instead, screen readers remain focused on the content of the Digital Platform's underlying page, making the pop-up invisible to screen reader users, including Jones. As a result, Jones is unlikely (or unable) to perceive this information independently, information which is prominently featured to shoppers who do not use screen reader technology to shop online.

b.      The products that Defendant sells on its Digital Platform are available in several different colors. Consumers who perceive content visually may click or tap their screen to select the color they wish to purchase or view. Unfortunately, consumers who use screen readers to shop online cannot do the same. Instead, the Digital Platform is designed in such a way that screen readers cannot change their selection from the color option that Defendant selects by default. This is because screen readers skip from the text above these color options to the text beneath,



or in this case, from "Nash" to "Marbled Malbec," making it impossible for screen reader users to adjust the default setting. This access barrier limits blind shoppers' access to a fraction of Defendant's online store.

      c.    Consumers who perceive content visually will notice a pop-up window when attempting to select a lens type. This pop-up window prompts consumers to answer various questions to complete their purchase, like whether they want non-prescription, prescription, or reading lenses. Unfortunately, Defendant fails to notify screen readers when this pop-up window appears. Instead, screen readers remain focused on the content of the Digital Platform's underlying page. As a result, screen reader users, including Jones, are unlikely (or unable) to select a lens type because they cannot answer the mandatory prompts contained in this pop-up window.



d.      The      Digital
Platform  does  not  include
sufficiently  descriptive  labels
or  instructions  when  content
requires  a  consumer  to  submit
information      or      activate
particular   features.   Without
these instructions, screen reader
users cannot fully navigate the
webpages.       For       example,

 

consumers who perceive content visually will recognize the "decrease quantity" and "increase

quantity" buttons on the Digital Platform and understand that by clicking them, Defendant will

decrease and increase the size of their order accordingly. Unfortunately, these buttons are not

labeled with sufficiently descriptive alternative text. When screen readers hover over these buttons,

Defendant announces "dash" and "plus," respectively. This audio alternative is difficult to

understand without perceiving the context in which it appears. As a result, screen reader users,

including Jones, are less likely (or unable) to use this feature independently.

e.      Consumers who perceive content visually will likely recognize the Digital Platform's floating Chat button and understand that by clicking it, Defendant will redirect them to its online help desk or instant messenger. Unfortunately, this icon is not labeled with sufficiently descriptive alternative text. As a result, when blind shoppers hover over it, screen readers announce "pop up button menu pop up double tap to activate the picker." Because this text is meaningless without additional context, Jones is less likely (or unable) to find the help she needs or to report the Digital Platform's many access barriers so they can be fixed.



### Plaintiff's Injury

41.     The access barriers described above, and others, deny Jones full and equal access to the services Defendant offers on its Digital Platform, and now deter Jones from attempting to use the Digital Platform.[32]

42.     Still, Jones intends to attempt to access the Digital Platform within the next six months to research the goods and services Defendant offers or to test the Digital Platform for compliance with the ADA.[33]

43.     If the Digital Platform were accessible (*i.e.* if Defendant removed the access barriers and implemented the practices described herein), Jones could independently access Defendant's online services.

---

[32]     *Your Digital Platform is Scaring Customers Away. 5 Easy Ways to Fix It*, *supra* note 12.
[33]     *See Norkunas* and *Iverson supra* note 27.

**Defendant's Digital Platform Must Comply with the ADA**

44.     The ADA "as a whole is intended 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'"[34]

45.     Title III advances that goal by providing that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."[35]

46.     DOJ regulations require that a public accommodation "furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities."[36]

47.     DOJ defines "auxiliary aids and services" to include "accessible electronic and information technology" or "other effective methods of making visually delivered materials available to individuals who are blind or have low vision."[37]

48.     Therefore, the ADA mandates that places of public accommodation provide auxiliary aids and services to make visual materials available to individuals who are blind.[38]

49.     Defendant is a place of public accommodation under the ADA because it is a "sales or rental establishment" and/or "other service establishment."[39]

---

[34]     *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 589 (1999) (*quoting* 42 U.S.C. § 12101(b)(1)).

[35]     42 U.S.C. § 12182(a).

[36]     28 C.F.R. § 36.303(c)(1); *see Bragdon v. Abbott*, 524 U.S. 624, 646 (1998) (holding that DOJ's administrative guidance on ADA compliance is entitled to deference).

[37]     28 C.F.R. § 36.303(b)(2).

[38]     28 C.F.R. § 36.303.

[39]     42 U.S.C. § 12181(7)(E), (F).

50.     The Digital Platform is a service, facility, advantage, or accommodation of Defendant.

51.     As a service, facility, advantage, or accommodation of Defendant, Defendant must ensure blind patrons have full and equal access to the Digital Platform's services.

52.     Indeed, the ADA expressly provides that a place of public accommodation engages in unlawful discrimination if it fails to "take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services."[40]

**Defendant Received Fair Notice of its ADA Obligations**

53.     Defendant, and other covered entities, have had more than adequate notice of their obligation to offer individuals with disabilities an equal opportunity to access and enjoy their online services and communications.

54.     Since its enactment in 1990, the ADA has clearly stated that covered entities must provide "full and equal enjoyment of the[ir] goods, services, facilities, privileges, advantages, or accommodations" to people with disabilities,[41] and must "ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services."[42]

---

[40]     42 U.S.C. § 12182(b)(2)(A)(iii).
[41]     42 U.S.C. § 12182(a).
[42]     42 U.S.C. § 12182(b)(2)(A)(iii).

55. DOJ first announced its position that Title III applies to websites of public accommodations in a 1996 letter from Assistant Attorney General Deval Patrick responding to an inquiry by Senator Tom Harkin regarding the accessibility of websites to blind individuals.[43]

56. Since then, DOJ has "repeatedly affirmed the application of [T]itle III to Web sites of public accommodations."[44]

57. In 2000, DOJ argued to the U.S. Court of Appeals for the Fifth Circuit that a business providing services solely over the internet is subject to the ADA's prohibitions on discrimination on the basis of disability.[45]

58. In 2002, DOJ argued to the U.S. Court of Appeals for the Eleventh Circuit that there is no need for a nexus between a challenged activity and a private entity´s "brick-and-mortar" facility to obtain coverage under Title III. DOJ argued that Title III applies to any activity or service offered by a public accommodation, on or off its premises.[46]

59. In 2014, DOJ entered into a settlement agreement with America's then-leading internet grocer to remedy allegations that its website, www.peapod.com, was inaccessible to some individuals with disabilities, in violation of the ADA. DOJ's enforcement action against this

---

[43]   *See* Letter from Deval L. Patrick, Assistant Attorney General, Civil Rights Division, Department of Justice, to Tom Harkin, U.S. Senator (Sept. 9, 1996), available at w https://www.justice.gov/crt/foia/file/666366/download (last visited May 18, 2020)

[44]   75 Fed. Reg. 43460-01, 43464 (July 26, 2010).

[45]   Brief of the United States as Amicus Curiae in Support of Appellant, *Hooks v. Okbridge, Inc.*, Case No. 99-50891 (5th Cir. June 30, 2000), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/hooks.pdf (last visited May 18, 2020) ("A COMMERCIAL BUSINESS PROVIDING SERVICES SOLELY OVER THE INTERNET IS SUBJECT TO THE ADA'S PROHIBITION AGAINST DISCRIMINATION ON THE BASIS OF DISABILITY.") (emphasis in original).

[46]   Brief for the United States as Amicus Curiae in Support of Appellant, *Rendon v. Valleycrest Productions, Inc.*, Case No. 01-11197, 294 F.3d 1279 (11th Cir. 2002), available at https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/rendon.pdf (last visited May 18, 2020).

online-only business affirms the ADA covers public accommodations that do not operate brick-and-mortar facilities open to the public.[47]

60.    In a September 25, 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed that public accommodations must make the websites they own, operate, or control equally accessible to individuals with disabilities. Assistant Attorney General Boyd's letter provides:

> The Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities.[48]

61.    In 2019, the United States Supreme Court declined to review a Ninth Circuit decision holding that (1) Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("Title III") covers websites and mobile applications and (2) the imposition of liability on businesses for not having an accessible Digital Platform and mobile application does not violate the due process rights of public accommodations.[49]

62.    Thus, since at least since 1996, Defendant has been on notice that its online offerings must effectively communicate with disabled consumers and facilitate "full and equal enjoyment" of the goods and services it offers.[50]

---

[47]    *See* Settlement Agreement Between the United States of America and Ahold U.S.A., Inc. and Peapod, LLC, DJ 202-63-169 (Nov. 17, 2014), available at https://www.justice.gov/file/163956/download (last visited May 18, 2020).

[48]    *See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018), https://www.adatitleiii.com/wp-content/uploads/sites/121/2018/10/DOJ-letter-to-congress.pdf (last visited May 18, 2020).

[49]    *See Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019) cert. denied 589 U.S. ___ (U.S. Oct. 7, 2019) (No. 18-1539).

[50]    *See* 42 U.S.C. § 12182(a).

## SUBSTANTIVE VIOLATION

### Title III of the ADA, 42 U.S.C. § 12181 *et seq.*

63.     The assertions contained in the previous paragraphs are incorporated by reference.

64.     Title III of the ADA guarantees that individuals with disabilities shall have full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation.[51]

65.     Defendant is bound by the regulations implementing Title III of the ADA, which require that places of public accommodation ensure effective communication to individuals with disabilities.[52]

66.     Jones is limited in the life activity of seeing and therefore an individual with a disability under the ADA.

67.     Defendant is a place of public accommodation under the ADA because it is a "sales or rental establishment" and/or "other service establishment."[53]

68.     Defendant owns, operates, or maintains the Digital Platform.

69.     The Digital Platform is a service, facility, privilege, advantage, or accommodation of Defendant.

70.     The Digital Platform contains barriers that prevent full and equal use by blind consumers, including Jones, using screen access software.

71.     Because of these barriers, Defendant denies Jones full and equal enjoyment of the information, goods, services, facilities, privileges, advantages, or accommodations that it makes available to the sighted public through the Digital Platform.

---

[51]     42 U.S.C. § 12182; 28 C.F.R. § 36.201.
[52]     28 C.F.R.§ 36.303(c).
[53]     42 U.S.C. § 12181(7)(E), (F).

72.     Although she intends to return to the Digital Platform in the future, these access barriers now deter Jones from attempting to use the Digital Platform.

73.     Defendant's discrimination is ongoing.

### PRAYER FOR RELIEF

WHEREFORE, Jones requests judgment as follows:

(A)     A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure the Digital Platform is fully accessible to, and independently usable by, individuals with visual disabilities;

(B)     A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to bring the Digital Platform into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that the Digital Platform is fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law—the specific injunctive relief requested by Plaintiff is described more fully below:[54]

---

[54]     The injunctive relief requested is consistent with a 2011 settlement agreement entered into between National Federation of the Blind and The Pennsylvania State University, available at https://accessibility.psu.edu/nfbpsusettlement/ (last visited May 18, 2020); a 2014 settlement agreement between the U.S. Department of Justice and Ahold U.S.A., Inc. and Peapod, LLC, *supra* note 47; and a 2014 Resolution Agreement between the U.S. Department of Education and Youngstown State University, available at https://www2.ed.gov/documents/press-releases/youngstown-state-university-agreement.pdf (last visited May 18, 2020).

(1)     Within 90-days of the Court's Order, Defendant shall complete an accessibility audit of its Digital Platform that will examine the accessibility and usability of the Digital Platform by consumers who are blind.

(2)     Within 180-days of the Court's Order, Defendant shall develop a corrective action strategy ("Strategy") based on the audit findings. In addition to the deadlines outlined below, the Strategy shall include dates by which corrective action shall be completed.

(3)     Within 210-days of the Court's Order, Defendant shall disseminate the Strategy among its executive-level managers, employees, and contractors, if any, involved in digital development and post it on the Digital Platform.

(4)     Within 90-days of the Court's Order, Defendant shall develop a Digital Accessibility Policy Statement that demonstrates its commitment to digital accessibility to blind and other print disabled consumers, as required by the Americans with Disabilities Act. This Policy Statement shall be posted on the Digital Platform within 120-days of the Court's Order, and shall disclose that an audit is taking or has taken place and that a Strategy will be disseminated and posted on the Digital Platform within 180-days of the Court's Order.

(5)     Within 240-days of the Court's Order, Defendant shall develop procedures to implement its Digital Accessibility Policy across the entire Digital Platform. Defendant shall disseminate its Policy and procedures to its executive-level managers, employees, and contractors, if any, involved in digital development.

(6)     Within 12-months of the Court's Order, Defendant shall conduct training, instruction and support to ensure that all executive-level managers and employees involved in digital development are aware of and understand the Digital Accessibility Policy, including proper

procedures, tools, and techniques to implement the Digital Accessibility Policy effectively and consistently.

(7)     Within 12-months of the Court's Order, Defendant shall hire or designate a staff person with responsibility and commensurate authority, to monitor the Digital Accessibility Policy and procedures.

(8)     Within 12-months of the Court's Order, Defendant shall develop and institute procedures that require third-party content and plug-ins built into the Digital Platform to provide blind consumers the same programs, benefits and services that they do to individuals without disabilities, except that when it is technically unfeasible to do so. Defendant shall effectuate these obligations by, among other things, implementing as part of its Request for Proposal process language that bidders meet the accessibility standards set forth in WCAG 2.0 Level AA for web-based technology and the Americans with Disabilities Act; requiring or encouraging, at Defendant's discretion, as part of any contract with its vendors, provisions in which the vendor warrants that any technology provided complies with these standards and any applicable current federal disability law.

(9)     Within 18-months, all pages hosted on the Digital Platform that have been published shall be Accessible to blind users. "Accessible" means fully and equally accessible to and independently usable by blind individuals so that blind consumers are able to acquire the same information, engage in the same interactions, and enjoy the same services as sighted consumers, with substantially equivalent ease of use.

(10)     Defendant shall not release for public viewing or use a substantial addition, update, or change to the Digital Platform until it has determined through automated and user testing that those proposed additions, updates, or changes are Accessible.

(11)    Defendant shall conduct (a) an automated scan monthly and (b) end-ser testing quarterly thereafter to ascertain whether any new posted content is accessible. Defendant shall notify all employees and contractors, if any, involved in digital development if corrections to Digital Platform are needed and of reasonable timelines for corrections to be made. Defendant shall note if corrective action has been taken during the next monthly scan and quarterly end-user test.

(12)    Following the date of the Court's Order, for each new, renewed, or renegotiated contract with a vendor of Third-Party Content, Defendant shall seek a commitment from the vendor to provide content in a format that is Accessible.

(13)    Defendant shall provide Plaintiff, through her counsel, with a report on the first and second anniversaries of the Court's Order which summarize the progress Defendant is making to meet its obligations. Additional communication will occur before and after each anniversary to address any possible delays or other obstacles encountered with the implementation of the Digital Accessibility Policy.

(C)    Payment of actual, statutory, nominal, and other damages, as the Court deems proper;

(D)    Payment of costs of suit;

(E)    Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment;[55]

---

[55]    See *Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11) ("[Plaintiff], as the prevailing party, may file a fee petition before the Court surrenders jurisdiction. Pursuant to *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987), and *Garrity v. Sununu*, 752 F.2d 727, 738-39 (1st Cir. 1984), the fee petition may include costs to monitor [Defendant's] compliance with the permanent injunction."); *see also* Amended Order Granting In Part Plaintiffs' Motion For Attorneys' Fees And Costs; Denying Administrative Motion To Seal, *National Federation of the*

(F)     Whatever other relief the Court deems just, equitable and appropriate; and

An Order retaining jurisdiction over this case until Defendant has complied with the Court's

Orders.

Dated: May 18, 2020                    Respectfully Submitted,

*/s/ Jason M. Leviton*
Jason M. Leviton (BBO# 678331)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
Phone: (617) 398-5600
jason@blockesq.com

Kevin W. Tucker (He/Him/His)
Pa. No. 312144
Kevin J. Abramowicz
Pa. No. 320659
**EAST END TRIAL GROUP LLC**
186 42nd St., P.O. Box 40127
Pittsburgh, PA 15201
Tel. (412) 877-5220
ktucker@eastendtrialgroup.com
kabramowicz@eastendtrialgroup.com

*Counsel for Plaintiff*

---

*Blind of California v. Uber Technologies, Inc.*, Case No 14-cv-04086-NC (N.D. Cal. Nov. 8, 2019), https://rbgg.com/wp-content/uploads/NFB-v-Uber-Amended-Order-Granting-In-Part-Pltfs-Motion-for-Attys-Fees-and-Costs-11-08-19.pdf (last accessed May 18, 2020) (finding plaintiffs "are entitled to reasonable attorneys' fees incurred in connection with monitoring [defendant's] compliance with the Settlement" of a Title III ADA case).